## BRISTOW v. ROSENBERG.

MORTGAGE—DEED—EVIDENCE—BONA FIDE PURCHASER.—The facts in this case show that the instrument purporting to be a deed was intended as a mortgage, and that the purchaser from the intended mortgagee was fully cognizant of the facts, and is not an innocent purchaser.

Before FRASER, J., Darlington, December, 1893. Reversed.

Action by Cherry Bristow and other heirs at law of Belford Bristow against Joseph Rosenberg and Philip Kalmus, to compel a reconveyance of a tract of land, for an accounting, and to enjoin an action in ejectment by the defendant, Rosenberg. Judgment for defendants. Plaintiffs appeal.

*Messrs. Boyd & Brown,* for appellants.

*Messrs. Woods & Macfarlan,* contra.

Feb. 29, 1896. The opinion of the Court was delivered by

MR. JUSTICE GARY. This action was originally commenced by Belford Bristow, but after the commencement of the action he died, and it was continued in the names of his heirs at law, who were substituted in his stead as parties plaintiff. In 1878, Belford Bristow, a negro, commenced to get his supplies from the defendant, Philip Kalmus, a merchant, then engaged in business at Darling-

ton. Nelson Scott, a son-in-law of Belford Bristow, was living with him at that time, and also commenced to trade with Philip Kalmus. Belford Bristow owned a tract of land, containing 130 acres, worth about $18 per acre, which he mortgaged to Philip Kalmus, in order to get supplies from him. In the fall of 1880, Kalmus sold to Bristow and Scott a tract of land, containing 100 acres, with the understanding that if they concluded, after a time, that they could not pay for it, he would take it back at the same price. Upon the title being made to Bristow and Scott, they united in a mortgage to Kalmus of both tracts of land. On the 5th day of December, 1883, Bristow and Scott jointly signed an instrument in writing, purporting to be a deed of conveyance of both tracts of land to Kalmus, for the expressed consideration of $2,441. Kalmus claims that this was a *bona fide* sale to him of both tracts of land. Bristow claimed, however, that it was made under the following understanding: That Kalmus was to get back the 100 acre tract, and to hold title to the 130 acre tract by way of security for what Bristow might then owe him, or might thereafter owe him, during their dealings together, and to convey back to Bristow at any time that he might pay up what he owed and require a conveyance. Bristow was to pay each year so much cotton as rent, but which he claimed was to be allowed him as a credit upon a settlement with Kalmus. Kalmus afterwards sold the 100 acre tract, and Bristow remained in possession of the 130 acre tract. In 1883, the defendant, Rosenberg, brother-in-law of Kalmus, and who had previously been a clerk for Kalmus, became his partner. In 1887, Kalmus sold out to Rosenberg, conveying to him the 130 acre tract, and moved to New York. Rosenberg attempted to eject Bristow and get possession of the land, and this action was brought to enjoin him from so doing, to ascertain the amount due by Bristow, to permit the same to be paid, and upon such payment to have a reconveyance of the land to Bristow.

His Honor, Judge Fraser, heard the case upon testimony

taken by a referee, and held that the plaintiff had failed to show, by sufficient proof, that the said deed was intended as a mortgage, and dismissed the complaint. The plaintiffs appealed to this Court from said judgment. The only issue raised by the appeal is as to the correctness of the Circuit Judge's conclusion that the evidence was not sufficient to justify a judgment that the deed was intended as a mortgage. It is alleged that when Bristow commenced trading with Kalmus, he was owing a small amount to one McSween, which Kalmus was to pay for him; that Kalmus delayed payment, and McSween recovered judgment; that when the 100 acre tract was to be taken back, Kalmus told Bristow to put the title of the 130 acre tract in him; that he would protect it against McSween and all other persons; that Bristow could get supplies on the faith of it, and have it reconveyed whenever he desired, by paying what he might then owe. We will now proceed to consider how far the allegations are sustained by the testimony:

*Julius Bristow*, a son of Belford Bristow, testified: He was present the day his father made the deed to the 100 acres and the 130 acres; Kalmus said his father had fallen behind, and he wanted him (Bristow) to make him a deed that would never harm him, and that he (Kalmus) could hold until he got his money. After Kalmus promised that he would not sell to any one else, and that he would give him back his deed when he paid up, father signed the deed.

*Belford Bristow*, a son, testified: Heard Kalmus talk with father about making him deed to 130 acres. He said that Belford was owing McSween, and that he had better make him a deed, as McSween would come with a judgment against him, and he had better let him (Kalmus) hold title to the land. But it wouldn't be anything only a form, and as soon as he paid up he would get his papers back, and said: "Bedford, I don't want your land."

*Isaac Bristow*, a son, testified: He heard what Peter said about Mr. Rosenberg coming up there to persuade mother to sign the deed; I was there both times he came up there

to get mother to come down and sign the papers; she had refused to sign them; I heard what he had said to mother; mother said she was not going to sign any more papers. Rosenberg said, "Cherry, this is nothing to hurt you." Rosenberg said, "I respect Belford Bristow as much as I do any white man—he is a hard working, honest man." He said, "I could not take your land, Cherry; I have not paid any money for it; I don't want it." This is as much as I know of the conversation. That was the first time he came out there; the second time he came, about a week after, he went over the same thing again. Rosenberg said, "It is nothing to hurt you, Cherry; it is just some papers I want to hold, and, whenever you settle, I will return these papers back to you." Under these circumstances she agreed to come down, and she came.

*Albert Parrott*, now clerk of the court, and at that time a clerk in the office of E. K. Dargan testified: They (Bristow and Scott) asked something about getting the land back, and Mr. Kalmus said if they would pay up everything, they could get the land back.

*Adella Scott*, daughter of Belford Bristow, testified: Ma went into that back room to sign the deed, but came back and did not sign it, and Mr. Rosenberg said that as soon as she paid out, he would return the place back to her; he wanted the papers to hold, and would give them back as soon as they paid up. Kalmus had promised to come around there and sign a paper that he would give the place back to them as soon as they had paid up, but he said he had a headache and would not come.

*Cherry Bristow*, wife of Belford Bristow, testified: When Mr. Kalmus wanted my husband to sign that deed, I did not like it at all; Mr. Rosenberg came up to see us about it; he told us he wanted us to come down and sign the papers to hold until we could pay up; I thought I was compelled to come down; he said he would hold the papers until the old man could pay up, and then he would return the papers; I came down then, and went into Mr. Dargan's office

to sign them; Mr. Kalmus did not go with us, but sent Mr. Rosenberg, and said he would, but said he had a headache, and did not come; he promised he would come the next day, and give us a paper showing that he would return the land, as soon as the old man paid up; Mr. Dargan found out that I did not want to sign the paper, and he told me that I was not compelled to sign it, and no sooner than he said it I turned round and came out of the room; Mr. Rosenberg told me that it was nothing to hurt me; he only wanted the papers to hold until the old man paid up, and he would return the papers to me, and I believed him, and went and signed the paper.

*C. L. Odom* (a white man) testified: He had a talk with him (Kalmus) about 130 acres of land in dispute. He tried to buy the land from Kalmus once, but Kalmus said it belonged to Belford Bristow, but Belford Bristow owed him, and he (Kalmus) would talk to him (Odom) afterwards about it. Kalmus said if Belford Bristow paid him up, the land would belong to him. He went to Kalmus afterwards and tried to swap his place to him for the Bristow place, and Kalmus again told him that the place belonged to Bristow. He does not know what year it was he first went to Kalmus about the land—about 1883 or 1885, or between the two.

*J. K. Windham* (a white man) testified: Kalmus told him (Windham), in January, that he wanted this conversation kept a secret, for if old man Bristow found it out, he would get the money and pay up. Kalmus said Bristow would have to pay up that fall or the land would be his (Kalmus'). He and Bristow came down in December of the fall that the money was due, and Bristow made the offer to Kalmus.

*Kalmus* and *Rosenberg* both testified, denying the foregoing statements.

*S. K. Jeffords*, a witness for the defendants, testified: He had a conversation with Belford Bristow in regard to the ownership of that land. Does not recollect the year. Bristow said that he had sold the land to Mr. Kalmus. He said

he received $11 per acre for it, and he (Jeffords) asked why he had taken that for it, when he (Jeffords) had offered more for it. His reply was that Kalmus had "out-talked him." He (Jeffords) had wanted to buy the land and offered more for it.

*C. A. Melton*, a witness for the defendants, testified: I tried to rent a piece of the land Belford Bristow was living on. Belford Bristow told me he could not rent it to me, because it was Mr. Kalmus' land, and Mr. Kalmus wanted him to tend it all. A short time after that, Mr. Jeffords asked him, in my presence, why he sold the land to Kalmus, when he (Jeffords) had offered him two dollars more an acre for it, and his answer was, "I sold it to him, and that is all." I think it was in 1887 that this talk was had.

The following was also introduced in behalf of the defendants:

Exhibit E. This exhibit has been lost. It is agreed that it is a statement to which is attached the names of Belford Bristow and Nelson Scott, signed by mark, and attested by J. Rosenberg, in whose handwriting is the whole paper, of date February 12th, 1884, and that the statement is as follows: Belford Bristow and Nelson Scott. 131 acres land, $1,141; 100 acres land, $1,300; total, $2,441. By mortgage on 131 acres, $627.98; by interest, $141.33; by amount paid John McSween, $150; by mortgage on 100 acres, $1,000; by interest on same, $300; by Scott Nelson, amount traded, $10; by Belford Bristow, $11.69; by amount paid to Nelson Scott, $99.95; by amount paid to Belford Bristow, $99.95; total, $2,441.

The date of the paper is 12th February, 1884, while the date of the deed is 5th December, 1883, and this fact tends to throw doubt on the claim of Kalmus that the $99.95 was the cash balance of the purchase money paid Nelson Scott and Belford Bristow on the day of sale. The appellants' attorney contends that the books of account offered in evidence show, as of date 12th February, 1884, an item of $99.65 written over an item erased; that this was not at

first carried over to the next page, which bears date as late as September, 1884, but was written over the credit which was at first carried over. It is also urged that the claim of the defendants is supported by the fact that Bristow paid rent on the 131 acre tract.

*Peter Bristow* testified: Kalmus did not call it rent except for the 100 acres. Kalmus said the rent father paid on the 130 acres could go on the debt, and when they settled up, the rent would be taken as payment. Peter Bristow also testified in regard to the book owned by Belford, which it was claimed was lost. The last year he traded with him, father and myself came down with the second or third cotton, and Mr. Rosenberg took the book after father traded some, and said he would fix it after awhile. He took the book and threw it under the desk and said he would fix it after awhile. He does not know what year it was, except it was the last year father traded with Kalmus and Rosenberg. Mr. Rosenberg got up and walked off, and we stayed there until about dark waiting for the book, and he never did come back. So the next time we came pa was wanting his book again. He (Bristow) was there, and Rosenberg put him off again, and said he hadn't fixed the book. Next time pa sent Lawrence Best to Rosenberg for the book, and the book yet wasn't fixed, and he came again. Mr. Rosenberg looked around under the desk and about there, and claimed that he could not find the book. Mr. Rosenberg · said the book was lost, and we have never been able to get the book. The book had all pa's old back accounts in it. Father's accounts with Rosenberg were kept in that book. Kalmus had the mortgage of Bristow and Scott for the purchase money of the *100 acre tract* satisfied upon the record 15th February, 1887, but the other two affecting the 130 acre tract still remained open. There was a great deal more testimony introduced, to which we have not deemed it necessary to refer.

The defendants served notice, that in addition to the grounds and finding of fact, upon which the Circuit Judge

rests his decree, they would ask this Court to affirm the same, for the reason that Joseph Rosenberg was an innocent purchaser of the land described in the complaint.

This Court does not so think, but, on the contrary, is of the opinion that the instrument of writing purporting to be a deed of conveyance was, in reality, intended as a mortgage, and that Rosenberg was fully cognizant of this fact.

It is, therefore, the judgment of this Court, that the judgment of the Circuit Court be reversed, and that the case be remanded to the Court below for such proceedings as are rendered necessary by reason of principles herein announced.